## CALDWELL *v.* ST. LOUIS PERPETUAL INSURANCE COMPANY.

The statute of Louisiana of the 6th March, 1834, requiring the captain, owners, or agents of
  steamers plying within this State, to cause the machinery of their boats to be examined by
  officers appointed under that law, ceased to have the force of law after the passage of the
  act of Congress of the 7th July, 1838, providing for the better security of the lives of pas-
  sengers on vessels propelled by steam. · The exercise by Congress of the power conferred
  on it by the constitution of the United States, to legislate on the subject, rendered the state
  law inoperative-
The rules and principles of marine insurance must be applied to the interpretation of policies
  of insurance effected upon vessels exclusively employed in inland navigation, when not in-
  applicable by reason of the particular subject matter.
Where a policy of insurance upon a steamer employed in inland navigation, after enumerating
  certain risks to be borne by the insurer, recites that, besides those particularly mentioned,
  the insurer will be answerable for " all other perils, losses and misfortunes which shall come
  to the damage of the said boat, according to the general laws of insurance," a loss resulting
  from a collision produced by the negligence of the officers of another steamer, though not an
  enumerated risk, will be covered by the policy, being one of the perils of the river.
The impossibility spoken of in the 5th section of the statute of the 6th March, 1834, relative
  to steamers, which declares " that any accident except such as are *impossible to be foreseen*
  *and avoided,* that may happen from racing, running into another boat," &c., shall subject
  the owner to the forfeiture of insurance, &c., must be considered as an impossibility by rea-
  sonable intendment, according to the circumstances of each particular case.

APPEAL from the Commercial Court of New Orleans, *Watts,* J.
  *Elmore* and *King,* for the plaintiffs.   A loss by collision is a loss by the
perils of the river, and is covered by the policy.   Hughes on Ins. p. 216.   1
Phillips on Ins, p. 636.   *Peters* v. *Warren Ins. Co.,* 14 Peters 112.   The ge-
neral competency of the pilot of the Buckeye is established by the evidence ;
and negligence on his part is no defence against an action by the assured, unless
it violate some of the implied warranties of the policy.   *Waters* v. *Merchant's*
*Louisville Ins. Co,* 11 Peters, 213. 10 Peters, 507. 3 Peters, 222. Hughes on
Ins. 216, 217. 1 Phillips on Ins. 579, 585.   *Henderson* v. *Western Marine and*
*Fire Ins. Co.,* 10 Robinson, 166.   The rule by which to ascertain whether the
negligence of the pilot forms a good defence for the Insurance Company, will
be found in 3 Peters, 235.   The case of *Hermann et al* v. *Western Marine and*
*Fire Ins. Co.,* 13 La. 516, was decided against the plaintiffs, on the ground of
the master having improperly taken a schooner in tow.   The case of *Dupeyre*
against the same company, 2 Robinson 457, turned wholly upon the question of
seaworthiness.   The provisions of the stat. of Louisiana of 1834, on the sub-
ject of negligence by the pilot, cannot serve the cause of the defendants.
The provisions of that law are repugnant to the constitution of the United
States, and were annulled by the act of Congress of 1838.   Gordon's Dig. p.
598.   The law of 1834, was a law regulating navigation, and, by the constitution,

CALDWELL | power to regulate all navigation, as well as commerce, was exclusively vested in
  *v.*    ⎟ Congress.  See *Gibbons* v. *Ogden*, 9 Wheaton 1.  *Brown* v. *State of Mary-*
ST. LOUIS,PER- ⎟
PETUAL INSUR- *land*, 12 Wheaton 419.  *City of New York* v. *Miln*, 11 Peters, 102.
ANCE COMPANY     *Hunton*, for the appellants.  The Buckeye was unseaworthy, the pilot being
incompetent, and the boat overloaded.  The collision resulted from the negli-
gence or want of skill of the insured, or of his agents.  13 La. 524.  2 Robinson
457.  13 Johns, 451.  1 Phillips on Ins. 312, 587, 597.  It was possible to have
avoided the collision, and under the 3d and 5th sections of the statute of 1834,
no recovery can be had on the policy.  Loss by collision is not an enumerated
peril, nor is it included under the term *perils of the river*, unless it occur with-
out any fault of the insured.  3 Kent 300.  Story on Bailment, 230, 2.  Ste-
vens and Benecke, 378.  1 Phil. on Ins. 635–6.  Abbott on Shipping, 256.

    *R. N. Ogden*, on the same side.

    The judgment of the court was pronounced by

    SLIDELL, J.  The defendants effected insurance in favor of the plaintiff on
the steamer Buckeye, for a certain term, the boat to be employed in the naviga-
tion of the Mississippi river, from New Orleans as high as Fort Adams.  The
policy was executed at New Orleans.  She was lost on a voyage within the po-
licy.  The plaintiff claimed for a total loss, and he had judgment in his favor in
the court below.  The defendants have appealed.

    The first point of defence presented by counsel is, that the Buckeye was un-
seaworthy, upon which point three propositions are submitted.

    It is said that the boat was not sound, but old and frail.  Upon this question
we are of opinion that the defendants cannot succeed.  Two inspectors of New
Orleans offices examined the boat, critically, eleven months before her loss, and
recommended her purchase to the plaintiff.  One of these inspectors was em-
ployed by the defendants to inspect the boat a few days before the loss, and upon
his favorable report the policy was executed.  A large sum, being nearly the
amount of the valuation in this policy, was spent in repairs a few months ante-
rior to the voyage in question.  She had received from shippers a full freight.
She started on her voyage crowded with passengers.  The defendants have not
presented any thing sufficient to overthrow the deduction of seaworthiness re-
sulting from these proofs.

    It is said that the steamer was *overladen*.  That she had a heavy cargo is
shown, and a witness was examined, who having shipped property in her and
having visited the boat when on the eve of her departure, conceived an anxiety
about her safety, and went immediately to effect insurance.  The underwriter
was aware that the boat was deeply laden, but appears not to have regarded the
lading as excessive, and gave a policy.  The witness was a professional man,
and acknowledges that he was not a good judge in such matters.  A merchant
also deposes on this point, who likewise visited her at the same time.  He had
goods on board, but felt no alarm and effected no insurance.  Other witnesses
depose that she was not unduly burdened.  We do not think the objection ten-
able under the evidence.

    It is next urged that there is no proof that the Buckeye was supplied with
the engineer's official certificate, as to the sufficiency of the boat, engines and
boilers, as required by the state act of 1834.  See Acts of 1834, p. 55.

    It might be questioned whether the proposition would, anterior to the act of
Congress of 1838, have been tenable to the broad extent in which it is stated by
the counsel.  It is not declared, by the statute, in such clear and express terms,

as to be free from all doubt, whether this statute was intended to comprehend within the requisitions of the second and third sections, boats plying between this and other States. But, however, this may be, we do not consider the objection tenable for the following reasons: This statute was enacted in the year 1834. In 1838, the Congress of the United States enacted a statue entitled "An act to provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam." This statute provided for the appointment of inspectors of vessels propelled by steam, and the Buckeye had obtained certificates from these inspectors. Thus, under the constitutional power to regulate commerce, Congress provided for this very subject matter, the inspection of the machinery and boilers of steamboats. If it be conceded that the State had the power, notwithstanding the constitutional grant to Congress, to legislate as to the inspection of boats plying between this and other States, yet we consider that Congress, by exercising, in 1838, the power, which on this subject until that period had lain dormant, absorbed this particular subject of legislation, and, *pro tanto*, rendered the Louisiana statute inoperative. Moreover, we are satisfied that the law of 1834, in this particular, even if not rendered inoperative, had become obsolete. If the chief magistrate of the State did not think proper to appoint an engineer to furnish the prescribed certificate, the assured cannot be held to have forfeited his policy by the non-performance of an impossibility.

Again, it is urged that the steamer was unseaworthy, by reason of the incompetency of her pilot. We do not think this point has been sustained by the evidence, but that, on the contrary, the plaintiff had fulfilled the condition precedent of the contract, by employing a pilot of competent skill. As to the conduct of the pilot upon the particular occasion which has given rise to this suit, it will be considered hereafter.

In March, 1844, while the Buckeye was on a voyage from New Orleans, and had reached Old River, this boat, and another boat called the De Soto, came into collision. Its consequences were as disastrous as they were sudden. The Buckeye almost immediately sunk, her hull and cargo became a total loss, and a large number of passengers perished.

As is usual in such cases, the officers and crew of each boat have strenuously endeavored to fix upon the other the responsibility of this appalling disaster. Numerous witnesses have been examined; their testimony was very elaborately discussed at bar by the respective counsel, and has, besides, received our careful consideration since the argument. This testimony presents, as usual, much that is vague, obscure and conflicting. We shall not recapitulate it, but state the result to which its examination has brought the court, mentioning specially only a few prominent facts, which in this conflict of witnesses we have deemed the *best test of the comparative weight of testimony*, and the safest guides to truth.

Old River, at that point of it where this wreck occurred, is more than one thousand yards in width. Its bank on one side is termed the willow bank, on the other the island. From the willows to the points where the Buckeye sunk is a distance of 476 yards, and from the wreck to the island shore is a distance of 557 yards. The space between the willows and the wreck, exhibits several snags. Though on this space, or bar, there is a good depth of water at certain seasons of the year, decreasing, however, as the willows are neared, yet this depth appears not to have been known to navigators till after this collision, and

CALDWELL
*v.*
St. Louis Perpetual Insurance Company

CALDWELL
*v.*
ST. LOUIS PER-
PETUAL INSUR-
ANCE COMPANY

the accurate examination to which it gave rise. It is satisfactorily shown that the Buckeye was as close to this bar as it was usual to navigate, especially at night.

It is also clearly established that, from the wreck towards the island side, the water deepens for a distance of 400 yards, and affords an abundant depth for boats of large draught as far as to within 100 yards of that bank of the stream.

It is also clearly established that, the well recognized usage of the Mississippi river, is for ascending boats to take the bar, and for descending boats to take the bend; that this usage prevails with regard to the particular locality in question; and that an ascending boat passes in the neighborhood of the bar, and a descending boat takes the deep water towards the island.

From these prominent and clearly established facts, results, unequivocally, this important deduction, that, at the moment of this fatal collision, the Buckeye was in her proper place, and the De Soto was not.

Such being the prominent facts not susceptible of dispute, there remains for our consideration the general assertions of conflicting witnesses, some making such representations as would indicate the Buckeye to have been in fault; others the De Soto. The mere numerical strength of witnesses is in favor of the plaintiff, but we do not attach, in such an inquiry, much importance to such a standard. The best guide to the ascertainment of truth in the settlement of that difficult question, the preponderance of testimony, is the application of important, well defined and clearly ascertained facts, if such there be, to the general mass of evidence. These facts, as above recited, must, from their nature, be thrown into the plaintiff's scale, and, in our opinion, outweigh the defendant's showing.

It is quite impossible in this opinion to discuss. in detail, the voluminous depositions which have been ably commented upon by counsel, and carefully considered by this court. We state, as the result of our examination, that this collision was not attributable to the fault of the plaintiff's officers or crew.

To what cause, then, is this disastrous collision attributable? In the absence of fault on the part of the Buckeye's officers and crew, we may imagine three classes of causes—the violence of the elements—a malicious and wicked intent on the part of the officers of the De Soto—negligence or mistake of those officers.

The two first classes are, in this case, out of the question. There was no violence of the elements, the weather was placid; the night was clear and moonlit; the current of the Mississippi, in some places and at some seasons impetuous, was in this place, and at this stage of water, so tranquil as to be scarcely perceptible.

There is not in the testimony the slightest ground to believe that there was a malicious intent on the part of the pilot, or other officers, of the De Soto. There was no bad feeling, nor even that rivalry which, to the disgrace of commanders and the imminent peril of life and property, so often leads to the inhuman disregard of a most sacred responsibility.

There is, then, nothing left to which this collision can be attributed, except the negligence or the mistake of the De Soto's officers, if, indeed, the distinction between negligence and mistake be admissible in a matter involving interests so momentous as the safe keeping of human life.

We believe that the De Soto was not navigated at this locality, according to the. usage of the river. Her proper place, even if we allow her to have been

entitled to as great a distance from the island shore as the middle of the stream    <span style="font-variant:small-caps">Caldwell</span>
as usually navigated, was much nearer to the island than the position which she    *v.*
actually occupied at the moment of the collision.   We cannot close our eyes to    <span style="font-variant:small-caps">St. Louis Per-</span>
the fact that, if she had been, at the moment when this collision occurred, in her    <span style="font-variant:small-caps">petual Insur-<br/>ance Company</span>
proper portion of the stream, the human beings who then perished would have
remained among the living.

It was strenuously urged that the Buckeye began too high up the stream,
and at too late a moment, to cross from the island to the bar.   If we are to be-
lieve the plaintiff's witnesses, this crossing was effected in the usual mode, and
in prudent season.   Even, according to the testimony of *Glasscock*, the witness
on whom the defendants so much rely, it is evident that several minutes must
have elapsed after the Buckeye began to cross before she reached the point
where she was struck.   The fact is certain, without any contradiction of his
testimony, that, at the moment of the collision, she had reached her proper po-
sition near the bar.   The boat, which sunk almost instantly, lies there still, an
indisputable memorial of this fact.

The usage of the river, and what is suitable in its practical observance, may
be illustrated, not improperly, by the familiar usage of the road.   The usage is
universal upon our streets and high-ways, that vehicles in passing should, each
respectively, occupy that portion of the road on its right.   If a wagoner, being
out of his proper position, sees, at a distance, another vehicle coming from the
opposite direction, his duty, if there be time, is to assume as promptly as may
be his proper portion of the way, and preserve that position in his further pro-
gress till the other vehicle has passed.   If he be in his right position when the
other vehicle is first observed, he maintains it.   Should he attempt to change it
suddenly in the latter case, or not attempt to regain it in the former, a collision
would be the natural result of a violation of the rule of the road.   For the dri-
ver of the approaching vehicle would naturally suppose that the rule of the
road would be observed, and would govern, accordingly, his own course, as they
approached.

The rule of the river, and the manner of its observance, present a strong
analogy to the above familiar case.   The descending boat, by that rule, takes
the bend, the ascending boat the bar; an unusual and sudden emergency might
require and justify a departure from this rule; but we look in vain in the record
for such a justification for the De Soto's officers.   The pilot of the De Soto, we
believe, mistook his position ; he probably thought that he was in the middle of
that space which lies, as we have described it, between the edge of the bar and
the island shore.   Even the middle of this space, when an ascending boat had
been previously observed, would not have been as discreet a position as one near
the bend, especially, as there was abundant water for a distance of some hun-
dreds of yards nearer the island.   The value of life and property does not jus-
tify, especially in navigating by night, a calculation by how few yards an ascend-
ing boat may be passed.   Men's lives are not to be saved by a mere inch or a
hair's breadth.

It thus appearing that this collision was attributable, not to the officers of the
Buckeye, but to the negligence of the pilot and other officers of the De Soto,
we have to consider the question of law.   Does a loss, thus occurring, entitle
the plaintiff to a recovery under the policy ?

This policy is partly a printed form of policy, prepared for insurance upon in-
land risks.   It is to be observed that the main frame-work of this policy is taken

12

CALDWELL
v.
ST. LOUIS PER-
PETUAL INSUR-
ANCE COMPANY

from the common marine policy. We are of opinion that these policies upon inland risks, thus modelled upon the marine policy, are to be interpreted, at least where such interpretation would not be inappropriate by reason of the particular subject matter, according to the well settled rules and principles of marine insurance. The policy of insurance is, in itself, a perplexed, awkward and uncertain instrument. But a long train of decisions in England and the United States, has given to this ancient instrument, the rude work of the Lombard merchant in the thirteenth century, a reasonable certainty. Should we refuse to apply to this instrument, when converted into an inland policy, the well ascertained rules of the marine law, where not manifestly inappropriate, we should find ourselves at once involved in a labyrinth of uncertainty and confusion. In this particular case the policy itself goes further than some inland policies which have come under our observation, and expressly declares, by a printed clause, in speaking of the risks to be borne by the underwriter, that they are, besides those expressly contracted to be borne, "all other perils, losses and misfortunes which shall come to the damage of the said boat, *according to the general laws of insurance.*"

Collision is not an enumerated risk either in this policy or in the common marine policy ; but it is covered by the marine policy, according to well settled authority, when the vessel insured is injured by a collision happening through the negligence of another vessel.

But it is argued that a distinction should be made between a collision on the sea and one upon a river. It is said, also, that the doctrine rests, to a certain degree, upon a technicality ; for although mismangement or neglect may have contributed to bring two ships into contact, the loss is immediately occasioned by the force of the winds and waves. That, in the case before us, there was no violence of the winds and waves, nor of current. That the motive power, or force which drove the De Soto and Buckeye into collision, was the power of steam, regulated and directed by human agency.

That such was the character of the force, and the sole force, which drove the De Soto upon the Buckeye, may be fairly assumed. The current slight, and, perhaps at the time even so slight as to be imperceptible, cannot be considered as having any agency in causing this collision.

Was this collision, then, under such circumstances, a peril of the river?

We are unable to distinguish this case in principle from the cases of marine collision found in the books. Let us take the case of the Helena, decided by Chief Justice *Mansfield.* The Helena, on a voyage from Honduras to London, was run foul of at sea by the Margaret, through the grossest neglect of the master and crew of this latter vessel, of whom only one man was on deck, and he was asleep. Now, here the winds and waves acting upon the sails and hull of this vessel, drove her upon the Helena. But these elements were under the control of the officers and crew of the Margaret. That they were so, is clear, otherwise Chief Justice *Mansfield's* expression, "the gross and culpable negligence of the officers and crew" would be unwarrantable. The sails acted upon by the wind were the means by which the vessel was propelled through the sea. These means, duly used, would have carried the Margaret clear of the Helena. Unduly, that is, negligently used, they drove the one vessel upon the other. The power of steam, and that of the steamer's helm properly used, would have carried the De Soto clear of the Buckeye ; negligently used, they drove the De Soto into collision with the plaintiff's steamer, and destroyed her-

The true spirit of the decision, or at least the judgment for the assured, whatever may be the literal terms used, is, not in the technicality of *causa proxima*, that the sea did the mischief; but in this, that the gross negligence of those navigating the Margaret, in not duly controlling the means and the element used to propel the vessel, was, in sound reason, a risk attendant upon the navigation of the ocean, and was justly comprehended and contemplated by the term *perils of the sea*, against which the underwriter promised indemnity.

<div align="right">CALDWELL<br>v.<br>ST. LOUIS PER-<br>PETUAL INSUR-<br>ANCE COMPANY</div>

Without discussing the refined doctrine of *causa proxima*, and the technical reasons upon which, in some of the cases, the loss by a marine collision caused by the negligence of the master or crew of another vessel is thrown upon the underwriter, it is sufficient now to say, that the judgments in such cases, in favor of the assured, have established the rule of law. And as this policy has declared that the general law of insurance is to be the guide in its interpretation, we must follow and apply the rule thus established.

While upon this subject, it is proper to notice the reference made by the counsel for the defendants to another provision of the statute of 1834. By the fifth section it is declared, "that any accident, except such as are *impossible to be foreseen and avoided*, that may happen from racing, carrying higher steam than may appear from the certificate to be consistent with safety, running into or afoul of another boat, or that may occur whilst the captain, pilot or engineer is engaged in gambling, or attending to any game of chance or hazard, or whenever an accident happens from the boat being overloaded, the owner of the boat shall be subject to the penalties provided for in the third section of this act, and the officer or officers of said boat violating the provisions of this act shall be subject to the penalties provided for in the fourth section thereof." These penalties are as to the owner, among others, forfeiture of insurance, and as to the officer, fine and imprisonment.

This section certainly comprehends the case of negligence. But we cannot justly consider the conduct, as proved, of *Klady*, the pilot of the Buckeye, as exhibiting a violation of the statute, and as imposing upon his owner the loss of insurance, and upon himself the onerous penalty of fine and imprisonment. As we have already said, he followed the usual course of navigation; he had placed his boat in her proper position when the collision occurred; and he had reasonable ground to expect that the De Soto would not violate the rule of the river, by chosing a position nearer the bar.

The impossibility spoken of in the statute must be considered an impossibility by reasonable intendment, according to all the circumstances of each particular case. It was possible for the pilot of the Buckeye to have avoided the collision by seeking the island shore and making fast there as soon as the lights of the descending boat were seen, or, as the De Soto's course eventuated, he would have avoided her by violating the rule of the river and running along the island shore. Such a possibility cannot be considered as what the statute contemplated. Under this view of the proper construction of the statute, it is unnecessary to consider the questions either of its constitutionality, its inoperativeness by reason of the act of Congress, or its obsoleteness.

Whether, under the law of insurance, the defendant would be liable if the collision could, under the evidence, be attributed to the negligence of the pilot or other officers of the Buckeye, is a question not necessary to be discussed here, and upon which we have studiously abstained from expressing an opinion.

<div align="center">*Judgment affirmed.*</div>